**Dorothy CANADA aka Dorothy Spinola, Plaintiffs,**

v.

**The BOYD GROUP, INC., California Hotel & Casino dba Sam's Town and Does Corporation I–XX, Robert Neuman, Stan Roth and Does XXI–XXX, Defendants.**

**No. CV–S–91–366–PMP (RJJ).**

United States District Court, D. Nevada.

Oct. 27, 1992.

Ian Christopherson, Las Vegas, NV, for plaintiffs.

Salvatore Gugino, Cobb, Gugino & Williamson, Las Vegas, NV, for defendants.

## MEMORANDUM DECISION AND ORDER

PRO, District Judge.

## I. INTRODUCTION

This action was commenced on May 17, 1991, when the original Plaintiffs, Dorothy Canada (aka Dorothy Spinola) and Paula Ervin, filed their Complaint (# 1). Plaintiffs filed their First Amended Complaint (# 2) on August 22, 1991, and added Sandra Millspaugh as a Plaintiff. Plaintiffs named The Boyd Group, Inc., Boyd Enterprises Inc., California Hotel & Casino d/b/a Sam's Town, Steve Strauss, Robert Neuman, Stan Roth, and Bob Heslen as Defendants.

The Complaint against Defendant Steve Strauss was dismissed on May 1, 1992, (# 34). On July 1, 1992, this Court dismissed Plaintiff Sandra Millspaugh's Complaint (# 60) and on July 8, 1992, the Court dismissed Plaintiff Paula Ervin's Complaint (# 62). On July 10, 1992, the Complaint against Boyd Enterprises, Inc. was dismissed (# 63) because the only count on which Boyd Enterprises was potentially liable (blacklisting and antitrust) had been dismissed on June 8, 1992 (# 45). On July 10, 1992, the Complaint against Defendant Bob Heslen was also dismissed (# 65).

On July 13, 1992, the remaining Defendants, The Boyd Group, Inc., California Hotel & Casino d/b/a Sam's Town, Robert Neuman, and Stan Roth (hereinafter "Defendants") filed a Motion For Summary Judgment (# 68). On August 7, 1992, the remaining Plaintiff, Dorothy Canada aka Dorothy Spinola (hereinafter "Plaintiff") filed her Response (# 77) and agreed to the dismissal of Count 3 (Blacklisting and Antitrust), Count 5 (Negligent Hiring), and Count 6 (Assault and Battery). Thus, Defendants seek summary judgment on the remaining claims set forth in Count 1 (Sexual Discrimination); Count 2 (Wrongful Termination); and Count 4 (Negligence). On October 23, 1992, the Court conducted a hearing regarding Defendants' Motion for Summary Judgment.

For the reasons stated below, Defendants' Motion For Summary Judgment is granted in part and denied in part.

## II. FACTUAL BACKGROUND

Plaintiff Canada's first contact with Defendants was on January 16, 1990, when she applied for employment as a poker dealer at Defendant California Hotel & Casino, d/b/a Sam's Town. This was the first time Plaintiff met Steve Strauss, the

poker-room manager for Defendants. As poker-room manager, Mr. Strauss had authority to hire, fire, make personnel decisions, and act as supervisor of all poker-room employees at Sam's Town. According to Plaintiff, on one occasion prior to her employment with Defendants, but after she submitted her application for employment, Mr. Strauss asked Plaintiff to dinner. The Plaintiff refused. This is the only time during Plaintiff's contact with Defendants that Plaintiff was ever asked out by Mr. Strauss.

In March of 1990, Plaintiff learned the position for which she had originally applied had been filled. Plaintiff returned to Defendants' establishment in April 1990, and spoke to Mr. Strauss who stated that if a position became available he would contact her. That same evening, around 9:30 p.m., Mr. Strauss called Plaintiff at home and offered Plaintiff a job. Plaintiff accepted. Because Mr. Strauss was the poker-room manager he would act as Plaintiff's supervisor upon hiring her.

On approximately April 24, 1990, Plaintiff reported for work at Defendants' establishment where she received her Employee Handbook. The Handbook included a section on sexual harassment. According to Plaintiff, over the next two to three weeks, Mr. Strauss's conduct included the following: two incidents of telling "off-colored" jokes (from which Plaintiff walked away); comments on how good Plaintiff looked in her uniform; smiling and looking at Plaintiff a great deal; one incident in which Mr. Strauss leaned or rubbed the front of his body on the back of Plaintiff's body and placed his hand on Plaintiff's shoulder (from which Plaintiff moved away); one other incident in which Mr. Strauss placed his hand on Plaintiff's shoulder; and, one phone call to Plaintiff at home.

Soon after these incidents, Plaintiff asked Mr. Strauss if she could work the "swing" shift, a shift Mr. Strauss did not work. Mr. Strauss told Plaintiff she would have to work whatever shifts she could get, but in fact she was assigned mostly swing shifts from that point on until her discharge.

Subsequent to this request, over approximately a five (5) week period, Plaintiff's and Mr. Strauss's relationship was strained. On several occasions Plaintiff asked Mr. Strauss if another dealer could work her shift. According to Plaintiff, Mr. Strauss rudely refused each request. On another occasion Plaintiff was sick and asked Mr. Strauss if she could leave early. Mr. Strauss refused this request. Later that same day Mr. Strauss allowed other dealers to leave early.

On June 14, 1990, Plaintiff spoke with Robert Neuman, manager of Sam's Town and Mr. Strauss's boss. Plaintiff told Mr. Neuman about the incidents with Mr. Strauss and stated that she thought Mr. Strauss was going to fire her because she had been unresponsive to his overtures. Mr. Neuman referred Plaintiff to Stan Roth, manager of Sam's Town casino, and also Mr. Strauss's boss. On June 15, 1990, Plaintiff related the same incidents about Mr. Strauss to Mr. Roth who told her that her allegations were serious and that he would initiate an investigation. Mr. Roth reminded Plaintiff that she was an at-will employee and as such could be fired for no reason at all. Additionally, Plaintiff admits she signed an employment application that included a statement that she was an at-will employee.

On June 16, 1990, Plaintiff reported for her shift in her uniform with a doctor's note indicating she was too ill to work. Plaintiff gave the note to Mr. Strauss who sent her home without commenting on the fact that she had failed to comply with General Rule No. 7 of Defendants' Employee Handbook. The Handbook clearly indicates that an employee is to give four hours notice when she is unable to report for a shift. Approximately five days later, Plaintiff's first day back to work, she received a disciplinary notice. Plaintiff refused to sign the notice, and after asking for but receiving no explanation as to why she was not put on notice immediately, Plaintiff stated she would speak to a higher authority. That same night Plaintiff was handed a suspension notice and told to

leave the building. On June 23, 1990, Defendants asked Plaintiff to come to Sam's Club for a meeting which she refused to do. Approximately one week later, Plaintiff picked up her paycheck and found a termination notice stapled to it.

### III. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir.1982). Once the movant's burden is met by presenting evidence that, if uncontroverted, would entitle the movant to a directed verdict at trial, the burden then shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If the factual context makes the respondent's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

If the party seeking summary judgment meets this burden, then summary judgment will be granted unless there is significant probative evidence tending to support the opponent's legal theory. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *Commodity Futures Trading Commission v. Savage*, 611 F.2d 270 (9th Cir.1979). Parties seeking to defeat summary judgment cannot rely on their pleadings once the movant has submitted affidavits or other similar materials. Affidavits that do not affirmatively demonstrate personal knowledge are insufficient. *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Likewise, "legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment." *Id.*

A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *See Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1305–06 (9th Cir.1982); *Admiralty Fund v. Jones*, 677 F.2d 1289, 1293 (9th Cir.1982).

All facts and inferences drawn must be viewed in the light most favorable to the responding party when determining whether a genuine issue of material fact exists for summary judgment purposes. *Poller v. CBS, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). After drawing inferences favorable to the respondent, summary judgment will be granted only if all reasonable inferences defeat the respondent's claims. *Admiralty Fund v. Tabor*, 677 F.2d 1297, 1298 (9th Cir.1982).

The trilogy of Supreme Court cases cited above establishes that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, that are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. at 2555 *quoting* Fed. R.Civ.P. 1). *See also Avia Group Int'l, Inc. v. L.A. Gear Cal.*, 853 F.2d 1557, 1560 (Fed.Cir.1988).

### IV. ANALYSIS

1. PLAINTIFF'S CLAIMS UNDER TITLE VII SEXUAL HARASSMENT

 A. Plaintiff States A Claim For Hostile Environment Sexual Harassment

Plaintiff's First Cause of Action alleges Defendants created a hostile work

environment in violation of 42 U.S.C. § 2000e, 29 C.F.R. § 1604.11(a), and N.R.S. § 613.330. A prima facie case of hostile environment sexual harassment exists when a female employee alleges conduct that "a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Ellison v. Brady,* 924 F.2d 872, 879 (9th Cir.1991). Thus, under *Ellison,* after drawing all favorable inferences to Plaintiff, this Court will grant summary judgment to Defendants only if no reasonable woman would find Defendants' conduct sufficiently severe or pervasive to have caused a hostile working environment.[1]

■ The required showing of severity of conduct varies inversely with the required showing of frequency of conduct when a court is to determine whether a reasonable woman would find her employment environment hostile. *Id.* at 878 (citation omitted). Thus, Defendants repeatedly urge this Court to note that no incidents of sexual harassment are alleged to have occurred after the first two to three weeks of Plaintiff's employment. Defendants' Motion at 8, 15, 19. But while frequency and severity of conduct are important factors to consider when assessing whether a hostile environment was created, ultimately it is the effect or consequences of conduct on the working environment that must be evaluated. *Id.* at 880. Thus, while none of Defendants may have considered Mr. Strauss's conduct to be severe or frequent enough to be offensive, under *Ellison* the

question is whether a reasonable woman, who had worked with Mr. Strauss, would consider his conduct severe and/or frequent enough to create an abusive working environment. The answer to that question is not sufficiently clear to warrant a grant of summary judgment in favor of Defendants.

■ Within a two to three week period approximately six (6) separate incidents occurred in which Mr. Strauss's conduct could be considered abusive. The most severe of these incidents included Mr. Strauss leaning or rubbing himself against Plaintiff. In fact, according to Plaintiff, she may have been encountering Mr. Strauss's alleged abusive conduct as frequently as every other day during her first few weeks of employment. Under *Ellison,* this Court cannot conclude that these facts present no material issue as to whether Mr. Strauss's conduct was severe and frequent enough to have created a hostile working environment for Plaintiff.[2]

On the record adduced, this Court cannot find as a matter of law that Mr. Strauss's conduct, evaluated in a light most favorable to Plaintiff, would not be considered by the average reasonable woman to be harassing. Defendants' Motion for Summary Judgment on Plaintiff's claim of hostile environment sexual harassment must, therefore, be denied.

### B. Plaintiff Fails To State A Claim For Quid Pro Quo Sexual Harassment

■ Under Title VII of the Civil Rights Act, a claim for quid pro quo sexual harass-

1. Defendants erroneously look to *Scott v. Sears, Roebuck & Co.,* 798 F.2d 210 (7th Cir.1986) for proper guidance for evaluating Plaintiff's claim. Defendants' Motion for Summary Judgment at 16. The United States Court of Appeals for the Ninth Circuit specifically rejected the reasoning of *Scott* in *Ellison v. Brady,* 924 F.2d at 877. Defendants also argue that their employee never touched Plaintiff on her "personal parts." Defendants' Motion at 15, 19. But there is no basis for Defendants to argue that such touching is in any way necessary in order for Plaintiff to establish a prima facie case of hostile environment sexual harassment. While *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) states that "not all workplace conduct ... may be described as 'harassment'", there is nothing in that case to

suggest that physical contact is necessary in order to establish a viable claim. Moreover, the Ninth Circuit is careful to explain that even a "well-intentioned compliment can form the basis of a sexual harassment cause of action." *Ellison,* 924 F.2d at 880. *See also Equal Employment Opportunity Commission v. Hacienda Hotel,* 881 F.2d 1504 (9th Cir.1989). Thus, Defendants' repeated reliance on this argument is without merit.

2. Defendants do not present any facts to controvert Plaintiff's allegations. Rather, Defendants rely primarily on case law that has either been rejected by the Ninth Circuit or is from district courts outside the Ninth Circuit.

ment is one in which an employer conditions "employment benefits on sexual favors." *Ellison*, 924 F.2d at 875. *Ellison* clearly distinguishes this from a hostile environment case in which an abusive environment is alleged. *Id.* Although the Court clearly views these as distinct causes of action, it is certainly feasible that the factual basis for a quid pro quo allegation and a hostile environment allegation may overlap. *See Carrero v. New York City Housing Auth.*, 890 F.2d 569, 579 (2d Cir. 1989). Plaintiff's factual allegations do not, however, rise to the level of quid pro quo.

In *Miller v. Bank of America*, 600 F.2d 211, 213 (9th Cir.1979), the court defined the essence of a quid pro quo allegation as a case in which a supervisor relies upon his authority to "extort sexual consideration from an employee." In the case at bar, Plaintiff has presented no evidence to support a claim that any supervisor used his authority to extort sexual favors from her. Plaintiff offers no evidence of statements or actions by any Defendants, including those dismissed from this action, that indicate that Plaintiff's continued employment, or other employment benefits, were contingent on her granting sexual favors. The fact that Plaintiff believed Mr. Strauss treated her badly because she was unresponsive to him is not sufficient to support an allegation that Mr. Strauss was using sex as a criterion for employment benefits. There is no evidence to suggest employment benefits were withheld from Plaintiff. Rather, Plaintiff claims that she was subjected to sexually inappropriate conduct by Mr. Strauss and that she was not allowed to leave early or have others work her shifts. To some extent the denial of these favors may be considered employment benefits; however, they much more directly reflect the environment in which Plaintiff had to work. Moreover, the allegation that Mr. Strauss may have treated other employees of Sam's Town in a manner arguably sufficient to constitute a claim for quid pro quo harassment is not relevant to show that Plaintiff's employment benefits were contingent on a quid pro quo.

■ Furthermore, this Court rejects Plaintiff's suggestion that the "reasonable woman" standard should be used to determine when quid pro quo occurs. Unlike hostile environment, for which the "reasonable woman" test was developed, quid pro quo sexual harassment does not need a gender-conscious reasonable person test to determine whether a violation of Title VII has occurred. If an employer conditions employment benefits on the granting of sexual favors, a civil rights violation occurs and the employer is strictly liable. No further evidence need be presented. *Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178, 186 (6th Cir.1992); *Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 62 (2d Cir.1992); *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir.1989); *Katz v. Dole*, 709 F.2d 251, 255 n. 6 (4th Cir.1983).

Plaintiff fails to state a claim for quid pro quo sexual harassment. Therefore, Defendants' Motion for Summary Judgment as to quid pro quo sexual harassment must be granted.

2. DAMAGES REQUESTED AND DEFENSES OFFERED

Plaintiff requests punitive damages, compensatory damages (emotional distress) and past and future wages lost. Plaintiff seeks such damages from the Defendants in their individual and corporate capacity. Defendants' liability for each request is analyzed below.

A. Defendants Fail To Present Sufficient Evidence To Shield Themselves From Liability

■ In 1986 the United States Supreme Court held that while an employer's liability for an employee's act that violates Title VII is not unlimited, the "absence of notice to an employer does not necessarily insulate that employer from liability." *Meritor*, 477 U.S. at 72, 106 S.Ct. at 2408. The United States Court of Appeals for the Ninth Circuit has interpreted this language to mean that employers are liable for hostile environment sexual harassment when they knew or should have known of the

harassment. *Ellison,* 924 F.2d at 881. An employer may also avoid liability by taking prompt and appropriate action to remedy the situation. *Id.* at 881–82. In this case, Defendants did not shield themselves from liability by taking prompt and appropriate action. First, Mr. Strauss continued to work for Defendants for nine months following Plaintiff's complaint. *See* Plaintiff's Response to Motion For Summary Judgment (# 77), Exhibit D pp. 31–33. Second, there is no evidence presented by Defendants that they took action that was "reasonably calculated to end the harassment." *Ellison,* 924 F.2d at 882 (citations omitted). Rather Defendants rely solely on the argument that they could not have reasonably known of the harassment. Thus, because Defendants fail to present any evidence to support a finding that they took appropriate remedial action, they can only prevail in avoiding liability if they can prove they neither knew, nor should have known of the harassment allegedly perpetrated by Mr. Strauss.

■ The facts of this case, when considered in light most favorable to Plaintiff, demonstrate that Defendants knew or had constructive knowledge of the hostile environment. First, Plaintiff has alleged that she met with "higher management" (Roth and Neuman) and expressed her concerns regarding Mr. Strauss. Deposition of Dorothy Spinola at pages 105–114. Moreover, in Defendant Roth's Deposition, taken May 13, 1992, he testified that there were a "series" of concerns regarding Mr. Strauss's professional conduct and that at one time Mr. Strauss was instructed to take "classes at a community college on how to get along with people as far as body language and as far as stuff like this right here." Roth Deposition at page 33. Given that Mr. Roth's statements were taken by Plaintiff in the preparation for this hostile environment sexual harassment case, his statement "stuff like this right here" can reasonably be interpreted to mean that Roth had some knowledge that Mr. Strauss behaved in ways that were unlawful under Title VII. Taken together, Plaintiff's and Defendants' statements demonstrate sufficient facts to raise a genuine issue of material fact as to whether Defendants had actual knowledge of the harassment.

■ Moreover, Mr. Strauss was Defendants' poker-room manager who had the authority to hire and fire employees, and as such, is considered an employer under 42 U.S.C. § 2000e(b). *See Bertoncini v. Schrimpf,* 712 F.Supp. 1336, 1339 (N.D.Ill. 1989). Therefore, Mr. Strauss's actions can reasonably be considered to be those of the employer itself and constructive knowledge ensues.

Plaintiff has set forth sufficient facts to demonstrate that there is an issue as to whether Defendants knew or should have known of the hostile environment and Defendants present no evidence from which the Court may infer they took appropriate remedial action following Plaintiff's complaints. Defendants' Motion for Summary Judgment on the issue of lack of knowledge must, therefore, be denied.

### B. Liability For Back Pay

#### 1. Corporate Liability

Under Title VII (42 U.S.C. § 2000e–5(g)) a plaintiff is entitled to back pay from an employer who has discriminated against her because of sex. 42 U.S.C. § 2000e(b) defines an employer, in pertinent part, as "a person engaged in an industry affecting commerce … and any agent of such a person." Plaintiff has established a prima facie case of hostile environment sexual harassment. Assuming Plaintiff ultimately prevails on her claim she will be entitled to damages unless Defendants offer a successful affirmative defense which they have thus far failed to do. Therefore, Defendants' Motion for Summary Judgment as to liability for back pay must be denied.

#### 2. Individual Defendants Are Not Liable For Back Pay.

■ To the extent that Plaintiff seeks redress in the form of back wages from Defendants Roth and Neuman in their individual capacity, Plaintiff's claims must fail. In 1982 the United States Court of Appeals for the Ninth Circuit held that individual defendants could not be held liable for back pay under 42 U.S.C. § 2000e–5(g). *Pad-*

*way v. Palches,* 665 F.2d 965, 968 (9th Cir.1982). *See also Seib v. Elko Motor Inn, Inc.,* 648 F.Supp. 272, 274 (D.Nev. 1986); *Pree v. Stone & Webster Corp.,* 607 F.Supp. 945, 950 (D.Nev.1985).[3] Therefore, Defendants' Motion for Summary Judgment as to individual liability for back pay must be granted.

### C. Liability For Compensatory And Punitive Damages

In *Williams v. U.S. General Serv. Admin.,* 905 F.2d 308, 311 (9th Cir.1990), the court held that damages for emotional distress were not available for a violation of Title VII. The Civil Rights Act of 1991 (42 U.S.C. 1981 *et seq.*) however reversed that rule and now a plaintiff is permitted to collect compensatory and punitive damages if that plaintiff can demonstrate intentional discrimination on the part of a defendant. In limiting award amounts, 42 U.S.C. § 1981a(b)(3) describes compensatory damages as including, *inter alia,* emotional pain and suffering. 42 U.S.C. § 1981a(b)(1) states a plaintiff may recover punitive damages if she demonstrates that the defendant was malicious or recklessly indifferent to her federally protected rights.

1. The Act is to be retroactively applied.

■ Defendants challenge the retroactive application of the Civil Rights Act of 1991 to this case. In *Sanders v. Culinary Workers Union Local No. 226,* 783 F.Supp. 531 (D.Nev.1992), this Court held that § 1981 of the 1991 Civil Rights Act was required to be applied retroactively given the status of the law of the Ninth Circuit. On October 6, 1992, the United States Court of Appeals for the Ninth Circuit held in *Fontaine Davis v. City and County of San Francisco,* 976 F.2d 1536 (9th Cir. 1992), that the Civil Rights Act of 1991 is to be applied retroactively.

Section 1981a of the 1991 Civil Rights Act provides a plaintiff with the avenue through which he or she may seek compensatory and punitive damages. In that the Ninth Circuit Court of Appeals has ruled that the 1991 Civil Rights Act is to be applied retroactively, the Court finds that Defendants' Motion for Summary Judgment opposing retroactive application of the Act must be denied.

2. Plaintiff's allegation of intentional discrimination under compensatory damages and punitive damages.

a. *Intentional discrimination and compensatory damages.*

■ In order for Plaintiff to recover compensatory damages for emotional pain and suffering, she must demonstrate that Defendants intentionally discriminated against her on the basis of sex. 42 U.S.C. § 1981a(a)(1). However, neither 42 U.S.C. § 1981a(a)(1) nor § (b)(2) defines "intentional discrimination" as it is to be applied when determining an award for compensatory damages. The language of this section does define "intentional discrimination" in the context of punitive damages. However, because there is a clear difference between the purposes of compensatory and punitive damages, this Court finds no basis to use the definition of "intentional discrimination" provided in the punitive damages section of the code when determining an award for compensatory damages. In the absence of statutory language defining intentional discrimination in the context of compensatory damages, this Court must look to the purpose of the 1991 Act and case law for guidance.

■ Congress' purpose in enacting the Civil Rights Act of 1991 was to strengthen the scope of federal civil rights protection

---

**3.** The Defendants erroneously rely on *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Defendants' Motion for Summary Judgment at p. 20. In *Monell* the court considered city and individual liability under 42 U.S.C. § 1983, not Title VII. The holding of that case does not directly bear on this decision. The Defendants also cite *Weiss v. Coca-Cola Bottling,* 772 F.Supp. 407 (N.D.Ill.1991) that considers indi-

vidual liability in a private employment setting. The *Weiss* court reviews the current trend regarding individual liability under Title VII. *Weiss,* 772 F.Supp. at 411. The court indicated that the Fifth and Eleventh Circuits have held that a supervisor, as an agent of the employer, is only liable in his or her official capacity. *Id.* (citing *Harvey v. Blake,* 913 F.2d 226, 227–28 (5th Cir.1990); *Sparks v. Pilot Freight Carriers,* 830 F.2d 1554, 1557–59 (11th Cir.1987)).

that had been weakened by recent United States Supreme Court decisions and to deter and to protect against unlawful discrimination in employment settings. Civil Rights Act of 1991 Pub.L. No. 102–166 §§ 2(1), (2), and (3). Specifically, section 3(4) of Pub.L. No. 102–266 states that one purpose of the act is,

> to respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination.

Thus, Congress has clearly expressed that the Civil Rights Act of 1991 is to restore and expand the rights of discrimination victims. Given this stated goal the test to prove intentional discrimination is not to be construed as a rigid one. An analysis of past Supreme Court decisions further supports this conclusion.

█ In 1981, the Supreme Court stated that "[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employees." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). Further, in 1985 the Supreme Court held that "[w]ithout question, when a supervisor sexually harasses a subordinate because of the subordinates sex, that supervisor 'discriminate[s]' on the basis of sex." *Meritor Savings Bank v. Vinson*, 477 U.S. at 64, 106 S.Ct. at 2404. *Meritor* also clearly states that " 'hostile environment' harassment ... violates Title VII." *Id.* at 65, 106 S.Ct. at 2405. Finally, in 1989, the Supreme Court recognized that direct evidence of intentional discrimination is difficult to produce and thus may be inferred when a plaintiff establishes a prima facie case of discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 271, 109 S.Ct. 1775, 1801–02, 104 L.Ed.2d 268 (1989) (O'Connor, J. concurring). This trio of cases clearly establishes that hostile environment sexual harassment is unlawful discrimination and that once a plaintiff establishes a prima facie case of discrimination she is entitled to a presumption of intent to discriminate. Thus, the legislative history of the 1991 Act and these cases

provide clear guidance for establishing a rule in this case: once a plaintiff establishes a prima facie case of hostile environment sexual harassment she is entitled to a presumption of intentional discrimination.

Once this Court concludes that a reasonable woman might find Defendants' conduct sufficiently severe or pervasive to have caused a hostile working environment, the Court makes an inference of intentional discrimination by Defendants. The Defendants can rebut this inference of intent either by providing sufficient facts to defeat the prima facie case, thereby defeating the inference of intentional discrimination, or by demonstrating that they took immediate and appropriate action to remedy the situation. *Ellison*, 924 F.2d at 882. In this case Defendants' Motion for Summary Judgment does not offer factual evidence to defeat Plaintiff's prima facie case, *supra* pp. 775–76, nor did Defendants take prompt and appropriate action to remedy the situations, *supra* pp. 777–78. Therefore, Defendants' Motion for Summary Judgment to dismiss Plaintiff's claim for compensatory damages from Defendants in their corporate capacity must be denied.

### 1. Defendants Roth and Neuman are not individually liable for compensatory damages.

█ Employers violate an employee's civil rights when they discriminate on the basis of sex and under 42 U.S.C. § 2000e(b) an employer includes, *inter alia*, "any agent of such a person." In *Seib v. Elko Motor Inn*, 648 F.Supp. at 272, 274 (D.Nev. 1986), the court considered whether the individual harasser, who was supervisor of a plaintiff, was an "agent" of the employer and thus could be held individually liable for damages under Title VII. The court noted that the only forms of relief available under Title VII were equitable in nature and defendants could not be held individually liable for such relief.

This rule is consistent with those cases cited by the Northern District Court of Illinois in *Bertoncini v. Schrimph*, 712 F.Supp 1336, 1340 (N.D.Ill.1989), in which

the court examined the issue of individual liability in Title VII cases. The *Bertoncini* court determined that those courts finding no individual liability have focused on "the fact that only equitable relief [was] available for Title VII violations." *Id.* at 1340. The *Bertoncini* court stated that equitable relief is generally provided by the "employer-entity" and thus no action may lie against the individual for such relief. *Id.* (citations omitted). However, the *Bertoncini* court also noted that some circuit and district courts have found employees individually liable. These courts have found that individuals who are supervisors with authority to make personnel decisions are agents of the employer under 42 U.S.C. 2000e(b), and thus, are liable as employers under this code section. *Id.* at 1339 (extensive citations omitted). In 1991, the United States District Court for Illinois resolved the conflict discussed in *Bertoncini* and concluded that the "more reasonable view" does not allow defendants to be held individually liable because "the damages available under Title VII are damages which an employer, not an individual would generally provide." *Weiss*, 772 F.Supp. at 411.

An important distinction exists between the case at bar and those discussed above. This Court is not being asked whether an individual defendant-tortfeasor may be held liable for damages. Rather, this Court is being asked whether the supervisors of the tortfeasor may be held individually liable for the tort of the co-worker they supervised. Neither Roth nor Neuman are alleged to have harassed Plaintiff, and Strauss, the alleged harasser, was dismissed from this action. Thus, Plaintiff seeks to hold Roth and Neuman individually liable for the harassing actions taken by Strauss. Logic and fairness do not allow for such a result. If individual liability for compensatory damages is to be imposed, it should only be imposed on the individual who performed the tortious act. Therefore, Defendants' Motion for Summary Judgment as to Plaintiff's claim that Defendants Roth and Neuman are not individually liable for compensatory damages

must be granted. This does not, however, affect the potential liability of Defendants Roth and Neuman for compensatory damages under the theory of respondeat superior.

### b. *Plaintiff fails to prove intent for punitive damages.*

The Civil Rights Act of 1991 gives Plaintiff a right to punitive damages if she can demonstrate that a Defendant "engaged in ... discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." [4] The Court finds, however, that Plaintiff's allegation of outrageous conduct on the part of Defendants does not provide sufficient facts to find maliciousness or reckless indifference. Without evidence that Defendants acted maliciously, with an intent to harm, or recklessly, with serious disregard for the consequences of their actions, Plaintiff's claim for punitive damages fails. Because Plaintiff fails to state a claim for punitive damages, Defendants' Motion for Summary Judgment as to punitive damages must be granted.

### 3. WRONGFUL TERMINATION

The Nevada Supreme Court has clearly established that an at-will employee may be discharged for any reason at the will of an employer. *K Mart Corp. v. Ponsock*, 103 Nev. 39, 42 n. 1, 732 P.2d 1364 (1987). The court has also held that despite an employee's status as "at-will", "[a]n employer commits a tortious discharge by terminating an employer for reasons which violate public policy." *D'Angelo v. Gardner*, 107 Nev. 704, 819 P.2d 206, 212 (1991). The court explained that "[t]he essence of the tortious discharge is the wrongful, usually retaliatory, interruption of employment." *Id.*

 Despite this rule, the court refused to find tortious discharge where plaintiff's discharge clearly violated Nevada public policy against age discrimination. *Sands Regent v. Valgardson*, 105 Nev. 436, 439, 777 P.2d 898 (1990). However, in explaining the *Sands* decision in *D'Angelo*, the

---

**4.** Note this court has already determined that the 1991 Act may be retroactively applied and therefore Defendants' Motion for dismissal on this basis is moot.

court stated that it based its decision on the fact that "specific statutory remedies" were available and had been paid to the plaintiff totaling close to $200,000. *Id.*, 819 P.2d at 217 n. 10. The *D'Angelo* court further explained that the *Sands* decision should not be taken to mean that the state's policy against age discrimination was insufficient to support an exception to the at-will doctrine that would allow for "remedial court action." *Id.* Rather, the decision meant only that no court remedy in addition to those provided for by statute were to be made available. *Id.* Thus, when an at-will employee is terminated in violation of Nevada public policy, a "court-created remedy" will be available under the rule of tortious discharge when the statutory remedies are insufficient to redress the wrong that has occurred. *See id.*, 819 P.2d at 216–17.

■ As was true for the Plaintiff in *Sands*, Plaintiff in this case is alleged to have been discharged in violation of Nev. Rev.Stat. § 613.330. That statute states, in pertinent part, that it is unlawful for an employer to fire any person because of his or her sex. Moreover, Nev.Rev.Stat. 233.-101(1) clearly indicates that it violates State public policy to discriminate on the basis of sex. Thus, there is no doubt that Nevada has a strong public policy against sexual discrimination in an employment setting. However, as was also true for plaintiff in *Sands*, Plaintiff in this case has numerous statutory remedies available to her, including back-pay, injunctive relief, compensatory damages, and punitive damages. The fact that Plaintiff has not yet received compensation for her alleged injuries is not controlling.

Clearly, the Nevada Supreme Court rests its determination on exceptions to the at-will doctrine on what statutory remedies are available to a plaintiff who has been discharged in violation of public policy. It is the availability of damages that controls the outcome of this determination not the success of the Plaintiff in obtaining those damages. In this case, assuming Plaintiff was terminated for reasons relating to her sex, that termination violates Nevada public policy. However, no additional court remedies need be made available to redress the tortious harm Plaintiff has allegedly suffered (compensatory damages) as well as compensate her for actual losses (back-pay).

Defendants' Motion for Summary Judgment on the claim of wrongful discharge must, therefore, be granted.

## 4. NEGLIGENCE

■ The gravamen of Plaintiff's negligence claim is that Defendants failed to "properly investigate the conduct of Steve Strauss" after a complaint about his behavior was made by Plaintiff. Plaintiff's First Amended Complaint, Count 4. This allegation is equivalent to a claim for negligent supervision. The Nevada Supreme Court has recognized the tort of negligent supervision, but has never established the essential elements of this cause of action.[5] In 1987 the State of Washington faced much the same situation as is presented here. In *Scott v. Blanchet High School*, 50 Wash. App. 37, 747 P.2d 1124 (1987), the court stated that while a cause of action for negligent supervision of an employee was recognized by the state there were no published decisions describing the nature of the duty. *Id.*, 747 P.2d at 1128. The court then applied the standard of ordinary care, *id.*, thus confirming that duty is typically based on reasonableness. The duty to supervise can then be said to be one that includes an employer's duty to use reasonable care in supervising the conduct of its employees.

In this case, the question posed is whether Defendants were negligent in their supervision of Mr. Strauss. Plaintiff has failed to allege sufficient facts to evaluate this claim. In Plaintiff's Response to Motion for Summary Judgment, she simply quotes three sections of the Restatement of

---

5. *See Oehler v. Humana, Inc.*, 105 Nev. 348, 775 P.2d 1271 (1989); *Hernandez v. First Financial*

*Ins. Comp.*, 106 Nev. 900, 802 P.2d 1278 (1990).

Torts (Second). There is no description of what Defendants did or did not do in response to Plaintiff's allegations except to state that Mr. Strauss continued to work for Defendants for nine months following Plaintiff's complaint. This, by itself, is not negligent behavior. Evaluation of reasonableness depends on the nature of the Defendants' conduct about which the Plaintiff has offered nothing. With no factual evidence upon which this Court can rely to assess a breach of duty, it is impossible to find a question of fact that needs to be resolved.

Therefore, Defendants' Motion for Summary Judgment on the claim of negligence must be granted.

## ORDER

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (# 68) is granted in part and denied in part as to Plaintiff's claims in Count 1 in accordance with the text of this Memorandum Decision and Order.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment is granted as to Plaintiff's claims set forth in Counts 2, 3, 4, 5 and 6, and Judgment is hereby entered in favor of Defendants and against Plaintiff as to said claims.

IT IS FURTHER ORDERED that Plaintiff's claims as to Defendants Robert Neuman and Stan Roth in their individual capacities are hereby dismissed.